Judgment for the United States.

## Case No. 15,015.

### UNITED STATES v. DUVAL et al.

[Gilp. 356.] 1

District Court, E. D. Pennsylvania. June 3, 1833; Dec. 13, 1833.

USAGE—INDIAN AGENT—EXTRA COMPENSATION: DISCRETION—DISALLOWANCE OF CLAIM —NEW TRIAL.

1. A usage, which is to govern a question of right between parties, must be so certain, uniform, and notorious, as to be understood and known by them.

[Cited in Pierpont v. Fowle, Case No. 11,152; U. S. v. Buchanan, 8 How. (49 U. S.) 102.]

[Cited in Blake v. Stump, 73 Md. 172, 20 Atl. 788; Carter v. Philadelphia Coal Co., 77 Pa. St. 291; Cope v. Dodd, 13 Pa. St. 35; Potts v. Aechternacht, 93 Pa. St. 142.]

2. The usage of a department of the government, in settling its accounts, can have no effect on those of an individual unless it is certain, uniform and notorious.

[Cited in brief in U. S. v. Ingersoll, Case No. 15,440.]

3. Although the salary of an Indian agent is fixed under the provisions of the act of April 20, 1818 [3 Stat. 461], at a certain sum, yet he has a right to an allowance in addition, for such services or expenditures as are authorised by a general usage of the department of war.

4. Where a charge, not prohibited by law, is supported by a clear equity arising from a bonâ fide performance of service by a public officer, or a bonâ fide expenditure of money for the public service, a discretion is properly vested in the head of a department of the government to allow it, although there is no express authority for it, and it is not a subject of strict legal right.

5. In all cases where a discretion is confided to the head of a department of the government, to allow or disallow a charge of a public officer, a court and jury have the same discretion over the charge, when it comes before them for revision and examination.

6. Where a public officer, at the request of the head of a department, performs other public duties than those properly belonging to his office, he is entitled to extra compensation.

[Cited in U. S. v. Ingersoll, Case No. 15,440.]

7. Expenditures made by an Indian agent, for the benefit of the Indians, and on a tract of land reserved and held by themselves, are not to be charged to the United States.

8. Under the provisions of the act of March 3, 1797 [1 Stat. 512], no claim of a public officer for a credit, can be admitted on a trial, unless it has been presented to and disallowed by the accounting officers of the treasury.

9. A suspension of a claim for a credit, by the accounting officers of the treasury, is not a disallowance, although no particular form of allowance or disallowance is required.

10. Where a controversy consists chiefly of questions of fact, the objections to a verdict must be very cogent to induce the court to grant a new trial.

[Cited in Briscoe v. Bronaugh, 1 Tex. 326.]

11. Where a jury render a verdict against the plain principles of law, as laid down by the court, and against clear and unquestioned evidence, the court will grant a new trial notwithstanding the particular circumstances or general justice of the case.

[Cited in U. S. v. Five Cases of Cloth, Case No. 15,110; Fearing v. De Wolf, Id. 4,711; Macy v. De Wolf, Id. 8,933.]

1 [Reported by Henry D. Gilpin, Esq.]

On the 25th of January, 1833, suit was brought in this court by the United States against the representatives of Edward W. Duval [Ellen Duval, and William Duval], to recover eleven thousand five hundred and thirty-eight dollars and fifty-four cents, for that sum of money alleged to have been received by him in his life time, and to be still due and unpaid. To this suit the defendants pleaded the general issue. The case came to be tried before HOPKINSON, District Judge, and a special jury, on the 3d of June, 1833, when the material facts established were as follows:

On the 7th of October, 1824, Mr. Duval was appointed Indian agent to the Cherokees on the Arkansas, and gave bond to the United States with two sureties, in the sum of ten thousand dollars, for the faithful discharge of the duties of the office. There being no agency house, he was authorized to build one at an expense not exceeding two thousand dollars. Finding, however, on his arrival there, that the other duties of his station prevented his attention to this object, and having a house of his own, such part of it as was necessary was occupied for the public use, and a rent of one hundred and twenty dollars per annum, allowed by the government. In 1826, however, it being considered absolutely necessary, he was directed to purchase a house at the cost first specified. This he did on the 31st of March, 1827, but the building requiring much alteration and repair, was not completed till the end of December, 1829, though partially occupied in June preceding; the entire cost of purchase, alterations, and repairs having amounted to two thousand six hundred and seventy-nine dollars and sixty cents. Mr. Duval was also directed to build, for the use of the Indians, a cotton gin, but limited to seven hundred dollars; the Indians themselves wishing a better one, offered him five hundred dollars more from their own funds, and ultimately agreed, should it cost above twelve hundred dollars, to supply the excess; it was finished in 1829, for eighteen hundred and seventy dollars and ninety-four cents. Immediately after his appointment, and with these instructions as well as others in regard to the general discharge of his duties as agent, Mr. Duval went to Arkansas. He remained there until January, 1828, acting to the entire satisfaction of the government, and obtaining much influence among the Indian tribes. He devoted himself especially to carry through the plan of removing the Indians over the Mississippi, and was entrusted with large disbursements for that object. His accounts appear to have been regularly rendered up to this time. In the winter of 1827, the Cherokees, urged on as they represented by the pressure of heavy grievances, determined to send a delegation to Washington, without the usual previous permission to do so, and with some difficulty prevailed on Mr. Duval to accompany it, on the 3d of January, 1828. This visit led to negotiations of importance, in which he acted as the principal negotiator for the government. They ended in a treaty with the Cherokees, on the 6th of May, 1828, for the cession of their territory lying within the boundaries of Arkansas, and removal beyond its western limits. By the fourth article, however, a small tract, on which various improvements had been made, was reserved from the general cession, and agreed to be sold by the United States, who were specially to apply the proceeds to erect a mill and other works, for the benefit of the Cherokees, in their new country. On the 6th of June the delegation left Washington to return home. Mr. Duval remained until the month of November following, up to which time he settled his accounts. He then returned to Arkansas, entrusted with carrying into effect the treaty made in the spring; and was also appointed agent for the Choctaws west of the Mississippi, though without any allowance for additional compensation. He was besides directed to receive the emigrant Indians from Georgia and the adjoining states, at the mouth of White river, and to provision and transport them west of Arkansas. On the 22d of April, 1829, the reservation, above referred to, was sold by the United States with all the improvements made upon it; the proceeds were two thousand and fifty dollars, and were applied to the benefit of the Indians on the new territory to which they removed. The reservation in question was purchased by Mr. Duval himself, and remained in his possession and that of his representatives, until the 26th of April, 1832, when the sale was cancelled by the secretary of war, on the ground that such a purchase ought not to be made by an Indian agent. To this decision his representatives assented, and the sum given by Mr. Duval was repaid. After his return to the agency, for a period of fourteen months, Mr. Duval received and disbursed very large sums of money in the performance of his various duties. He failed, however, to render any account during the whole of that time, by reason, as was afterwards alleged, of his constant engagement in the public service. After waiting till the 15th of January, 1830, the secretary of war informed him that the provisions of the law of January 31, 1823, relative to punctual settlements, being positive, and the accounting officers of the treasury having reported his failure to comply with them for so long a period, no other course was left than his removal. On the 15th of September, 1830, Mr. Duval died in Arkansas, no adjustment of his accounts having been made. In the spring of 1832, his representatives presented an account of the disbursements made by him, and his various claims for expenditures, allowances, and compensation, which resulted in a balance alleged to be due to him from the United States, of three thousand nine hundred and sixty-five dollars and fifty-one cents. On an

examination of this account by the accounting officers of the treasury, numerous items of charge were rejected, as inadmissible, or not sufficiently proved, and on the 26th of April, 1832, according to their report, he was at the time of his death actually indebted to the United States in the sum of eleven thousand five hundred and thirty-eight dollars and fifty-four cents, the debt to recover which this suit was brought.

The difference between the two accounts, amounting altogether to fifteen thousand five hundred and four dollars and five cents, was made up of numerous charges which were classed under the following general items; viz.

| | |
|---|---:|
| 1. The rent of his house for the agency, from October 1, 1826, to December 31, 1829....... $ | 390 00 |
| 2. His expenses and compensation at the treaty of May 6, 1828.. | 1,064 01 |
| 3. Expenses of the Indian delegation ..................... | 2,429 13 |
| 4, 5. Horses and steamboats for transporting emigrating Indians ..................... | 1,158 00 |
| 6. Loss of his horse and his expenses at an Indian council... | 147 50 |
| 7. His compensation as Choctaw agent ..................... | 500 00 |
| 8. A sum paid T. Graves under the treaty of 6th May, 1828..... | 1,125 00 |
| 9. Purchasing looms for the Indians ..................... | 54 46 |
| 10. Sending a special messenger to Washington ............... | 250 00 |
| 11. Services of an interpreter to the Indian delegation .......... | 300 00 |
| 12. Forage for his own horses..... | 466 64 |
| 13. Expenditures on the agency house above $2,000.......... | 679 60 |
| 14. Expenditures on the cotton gin above $700 ............... | 1,170 94 |
| 15. Expenditures on the Cherokee reservation before its sale.... | 270 35 |
| 16, 17. Expenses and provisions to Indians visiting the agency... | 177 00 |
| 18. Provisions to emigrating Indians | 891 24 |
| 19. Expenses at the agency for the Indians ................... | 1,017 50 |
| 20. Provisions for and charges on account of emigrating Indians. | 1,861 93 |
| 21, 22, 23. Special services and expenditures required at the agency ..................... | 123 00 |
| 24. Expenditures on the reservation while it was in his own possession ..................... | 1,427 75 |
| | $15,504 05 |

Mr. Gilpin, U. S. Dist. Atty.

The amount in dispute in this case is large, but it is also important from the circumstances connected with it. Nearly three years have elapsed since the death of Mr. Duval, so that the fullest opportunity has been afforded to elucidate and explain every part of the transactions. The whole accounts have been thoroughly investigated by the accounting officers of the treasury, with the aid of his representatives, and under the immediate inspection of those officers of the government, who have long been versed in all the minutiæ of such accounts, and are well acquainted with the expenditures necessary for an Indian agent. We are to consider in the outset the duties of the agent, his compensation, and the disbursements he can lawfully claim allowance for. His duties, as defined by law, are to receive and dispose of goods to the Indians on public account, to carry into effect the various provisions of the treaties with them, and to account regularly every quarter. His compensation was at first a salary and certain rations, but in 1818 it was fixed at fifteen hundred dollars, to embrace all allowances for himself, his clerks, and every service connected with his office. His disbursements are either those necessary to his place, or such as are extra and contingent; before he can claim allowance for them, all, even the most necessary, must be accurately vouched; when, however, they are extra or contingent expenditures, a mere voucher of their having been made is not sufficient, they are not left to his own discretion, they must be sanctioned by the secretary of war, or proper officer of the department. These rules are to govern us in admitting or rejecting the claims that are now made by Mr. Duval's representatives; such as are strictly within the duties of his office must be satisfactorily proved; such as are not must have the sanction of the department.

The first two items are evidently contingent, and are expressly refused by the treasury for want of the proper sanction. Nor are they just. In the first, rent is charged for his own house long after one had been purchased by the United States, or at least long after Mr. Duval had received the money to purchase one; and in the second, he was performing the duties of his office at a distance from his agency, but certainly not with more labour, and for this he was receiving his salary. The next three items depend entirely on vouchers of the sufficiency of which the jury must judge. The sixth, however, is clearly within the provision for compensation fixed by law, and to authorise its allowance in addition, the sanction of the department even would scarcely suffice; yet this is entirely wanting. The claim for compensation for the Choctaw agency, is directly at variance with the terms entered into on his appointment, which were, that there should be no additional allowance. The payment to Graves is provided for by the treaty, and was to be made by the United States; it was actually paid at the treasury; and this payment by Mr. Duval was without authority, which he ought first to have obtained. The next item is a matter of proof, the object of the expenditures being within the duties of the agent. The three which follow are altogether contingent, altogether such as an agent ought not to make without previous authority; to send a messenger to Washington at a heavy expense, when the documents could have been transmitted by mail; to employ an additional interpreter when there was one attached to this tribe, and regularly in the service and pay

of the United States; and to charge the United States with the keeping of his own horses, when his compensation is fixed by law, and limited to a sum which is expressly to include all the charges for his official acts and services; these are expenditures which, if allowed on the mere discretion of the agent, and without the sanction of those officers whom the law authorises to control him, would lead to the most lavish system. The thirteenth item is an expenditure by an agent directly contrary to his instructions, which limited him to two thousand dollars. The fourteenth and fifteenth are charges that never should have been made to the United States; in their cession the Indians made a "reservation" of a small tract of land for their own use; on this a cotton gin was erected for them, towards which the United States agreed to contribute seven hundred dollars and no more; certain improvements which the Indians wanted were also made for them; the disbursements were made by the agent, but were entirely for the benefit of the Indians; any additional ones, therefore, on the house, on the gin, or on the reservation itself, were chargeable to them; they knew the limitation fixed on the buildings; they expressly retained the reservation as their exclusive property; the agent was equally acquainted with both circumstances; the former never expected these payments to be made by the United States, and the latter had no right to charge them with them. Most of the charges embraced in the eight following items are matters of proof for the jury, but among them are found some, contingent in their character, and being without the sanction of the war department, inadmissible. To the last or twenty-fourth item, there is an evident and unanswerable objection; it has never been disallowed by the treasury; it is not included among the rejected items making up the balance claimed from Mr. Duval. The fourth section of the act of March 3, 1797, expressly declares, that in suits between the United States and individuals, no claim for a credit shall be admitted upon the trial, but such as have been presented and disallowed by the accounting officers, which is not the case with this item. In fact, the treasury have given the defendants time to produce their proof; they are not disposed to reject it; it is not the subject of controversy now as to its principle; there is nothing that makes it yet a proper matter for the investigation of this tribunal. 1 Story, Laws, 464 [1 Stat. 512]; 2 Story, Laws, 1189, 1191 [2 Stat. 653, 654].

J. R. Ingersoll and Mr. Sergeant, for defendants.

The existence of a suit does not in any degree authorise the inference that there is any, the smallest, amount unaccounted for by the public officer. It does not necessarily imply that the accounting officers of the government ever thought that such was the case. It is perhaps deemed a convenient mode of settling an account which must be settled somewhere, and justice is not anticipated in her results by any of the preliminary proceedings. The argument on behalf of the United States seems to presume, that the decision here is to be controlled by what the public officers at Washington have done, or have refused to do. This is not so. The whole matter is before the court and jury, and on the broadest equitable principles. It is no doubt true, that in settling accounts at the treasury, the accounting officers require the sanction of the head of the department for an expenditure evidently contingent; but this court and jury do not require his sanction; they have the same power to make the allowance that he has, and so the supreme court has expressly decided. More than this, if the accounting officers or the secretary should reject a claim because not authorized by law, this court could allow it, should they deem it equitable. It has been alleged, that, as the claim for many of these expenditures rests on the usage of the department in allowing them, and the sanction of the secretary has been always given to such allowances, consequently his sanction forms part of the usage; but to this it is answered, that the sanction of the secretary is not a constituent part of the usage, which is limited to the thing done and the circumstances necessarily attendant on it; if it has been usual for the secretary to allow a charge, and he shall refuse to do so in a particular instance, the court and jury are to do what he ought to have done. These principles have all been clearly established by the supreme court. U. S. v. Macdaniel, 7 Pet. [32 U. S.] 1; U. S. v. Ripley, Id. 18; U. S. v. Fillebrown, Id. 28.

The first item of charge hardly admits of a question; the United States agreed to furnish an agency house, and one fit to live in was not finished till December 31, 1829; of course they must pay the rent till that time; nor did Mr. Duval receive any money until he bought the new house; he was merely authorised to draw it before; it was a credit, not a payment. To his compensation in effecting the treaty he is justly entitled; his great services are proved; it was not part of his duty as an Indian agent; he was expressly requested to act by the government; and similar allowances have been made in cases exactly similar. The third, fourth and fifth items were rejected for want of vouchers, which have been furnished at this trial, and of course remove the objection. The expenses of Mr. Duval, at the council, have been admitted by the accounting officers, but the item has been rejected because it includes a charge for the loss of his horse: we have proved this loss to have been in the service of the United States, and occasioned by duties he was performing for them; a circumstance giving him an unques-

tionably equitable claim. His charge as Choctaw agent is for his expenses; the agreement that he was not to receive additional compensation, never was intended to deprive him of the repayment of expenses, expressly occasioned by his assuming gratuitously a new duty. The double payment to Graves is an error which ought not to fall on Mr. Duval; he was authorised to make it under the general agency connected with the treaty; he did so: after he had actually paid it in Arkansas, the treasury pays it, without inquiring, at Washington; the blame is there, and Mr. Duval must not be made to suffer. We have fully proved the expenditures in the ninth item. Those in the tenth and eleventh are of the most equitable character; important accounts and vouchers were to be transmitted through the wilderness; they related to the fulfilment of an interesting treaty; the expenditure of thousands of dollars depended on them. So in the employment of an interpreter, surely in adjusting an important treaty, it was no extravagant exercise of discretion for Mr. Duval to have his own interpreter, in addition to the one belonging to the Indian delegation; the United States were the sole gainers by it, and to throw the expense on their authorised agent would be manifestly unjust. Mr. Duval was allowed to purchase two horses at the expense of the United States; he did not do so, but employed his own in their service; to pay him for their forage is surely most equitable; and it never was intended that, under such circumstances, it should be deducted from his compensation. The limitation of two thousand dollars for the agency house was applicable to the cost of the building; this excess has arisen from the land, and that land has since become the property of the United States: will they make the agent pay from his own pocket for property they hold themselves, especially when he has proved the bona fide expenditure of the sum in a purchase directed by them? The expenditures on the reservation were made by Mr. Duval; no doubt at first for the Indians, but by the treaty the United States agreed to sell this reservation and give the proceeds to the Indians; they have done so, and paid them the whole sum it brought with the improvements; but at the time of sale these improvements had not been paid for, and the United States were bound either to deduct their cost from the sum received and pay it to Mr. Duval, who made them, if the treaty meant the net proceeds; or if it meant that the Indians were to receive the whole for a gift as it stood, then they were to pay off the cost of the improvements besides; in either case, as the sale of the property was entrusted to them, Mr. Duval has a right to look to them for this payment. The remaining items, except the last, depend entirely on the sufficiency of the proof, and that offered on this trial seems in most respects amply sufficient. In fact, the only cases not almost indisputable, are those of the allowance to the blacksmith, McDavid, for his assistance in the nineteenth item, and to Flower, for his services as a commissary in furnishing provisions: it is alleged that these are included in the general payments of their respective contracts, but the evidence appears sufficient to show that they were extra expenditures, and entitled to a separate allowance. The twenty-fourth item ought to be submitted to the jury; it is part of the same transaction which should be definitively closed by their verdict; the charge itself is very just: Mr. Duval purchased the land without any idea that the government would disapprove of it; he expended this money on it when it was his own; the United States took it from him and now retain it; they have the benefit of all he did, and of course ought to pay for it. It has, however, been submitted to the treasury and there suspended, which is tantamount to a disallowance; it therefore forms a set-off, such a one as would be indisputable between man and man; such a one as the act referred to by the district attorney never meant to exclude; the intention of that law was, to give the United States an opportunity of examining, through its officers, the claims presented, before they were submitted to a judicial investigation; this has been done, and the accounting officers have not been satisfied of their correctness; in no respect, therefore, will the United States suffer any injustice by its admission, while the defendants will be subjected to great hardship by a refusal.

Mr. Gilpin, U. S. Dist. Atty., in reply.

It has not been contended that the jury are to be bound by the decisions of the accounting officers; but merely that their reasons in rejecting many of the claims are entitled to great weight, as persons well acquainted with the usages in regard to such agencies, and the nature of the vouchers, and having no interest whatever. This ought especially to weigh in the present case, because these accounts have been all made up since the death of Mr. Duval, and every rejected item is presented for the first time since that event, though the actual disbursements took place before. It is to be remembered too, that though the amount in dispute is large in itself, yet it is not so in comparison with the aggregate of Mr. Duval's disbursements, which was probably more than a million of dollars. The principles which govern the allowances here are simple. First, to allow Mr. Duval the specific sum for his own compensation and expenses which the law authorises. Secondly, to require adequate proof of all his disbursements. Thirdly, where the disbursements have not been specifically authorised by law or settled usage, to require the sanction of the secretary of war. To the last, which embraces most of these disputed

charges, the defendant's counsel object. They deny the necessity of the allowance of the secretary in contingent expenditures, and assert that if the jury think them proper, that is sufficient. To this it is answered that the law means to require the secretary specially to superintend all contingent expenditures, he is held responsible for the disbursement of the contingent fund for Indian affairs, he is obliged to report annually every payment made from it, he knows what an agent in remote districts, in Arkansas for instance, ought to apply it to, which surely a jury in Philadelphia cannot. The allowance therefore of the secretary converts what is contingent into a specific expenditure. The appropriation by law is general when first made; this sanction makes it specific; it does what congress have done in many points, and would have done in all, could they have known every want of the agency. When the defendants rest their claim on a usage of the department, they seem to admit this principle; for that usage is itself an implied sanction. It is in their application of the usage to their particular claims that they fail; a uniform or general admission of the very same allowance must be proved, which they have failed to do; in the Case of Macdaniel, the express approval of the same services for which he claimed compensation was proved on previous and repeated occasions, and the question was as to the amount of compensation; in the Case of Fillebrown there was an implied contract to do the act previously ascertained, the amount of compensation alone was left unsettled.

It is contended therefore that in regard to all disbursements, falling within the class which is to be paid from the appropriation for "contingencies," the following rules are to govern the allowance: (1) That the appropriation is made by law, to be applied only to such cases as the secretary of war sanctions, and consequently, that all claims for "contingencies" not sanctioned by him, must be allowed by the legislature, not by the courts. (2) That if such claims could be the subject of judicial allowance, still, in the absence of any express contract between the government and Mr. Duval, as to the services performed or the amount to be paid for them, the evidence of the implied contract must rest upon the usage proved in the cause; that according to such usage the allowance for contingencies, both as to the necessity of the services and the amount to be paid for them, has been invariably governed by the decision of the secretary of war in each particular case; that therefore no claim for contingencies ought to be allowed to the defendants, which has not been specifically sanctioned by the secretary of war. (3) That there was an implied contract between Mr. Duval and the government, to take such sum for every contingent service performed by him, as might be allowed by the existing head of the department at the time of settling his account; that therefore his representatives can claim nothing for contingent services without such allowance. These principles are not in opposition to the decisions of the supreme court, which have been cited; they place the judgment on an officer who is well fitted by his situation to form a correct one, and whom congress have obliged to report annually and made responsible; to do otherwise would be to submit to the uncontrolled discretion of a subordinate agent, in a remote place, who is amenable to no one whatever.

If these rules be correct, then the claims of Mr. Duval for allowances for the rent of his own house from April 1, 1827, to December 31, 1829; for his services at Washington, in procuring the acceptance of the treaty of May 6, 1828, by the Cherokees; for the loss of his horse in going to an Indian council; for forage of his own horses from January 1, 1826, to August 1, 1830; and for special services rendered by himself at the agency; not having been sanctioned by the secretary of war ought not to be allowed. They were all services of his own, rendered in the performance of those duties for which he received by law a specific compensation. and if the secretary, who knew all the facts and circumstances, did not consider them as extraordinary, they ought not to be paid for from the contingent fund. The same remark may be made as to his employment of expresses and an additional interpreter; they are expenditures in relation to the ordinary duties of his agency, of the propriety of which the head of the war department could best judge, as well as of the fund from which they ought to be paid. As to the claims of Mr. Duval, for allowances for disbursements made by him on the property and improvements called the "Cherokee Reservation," mentioned in the fourth article of the treaty of May 6, 1828; viz. for building and repairing the agency house, over and above the sum of two thousand dollars. either before or after the sale of the reservation; for erecting a cotton gin, over and above the sum of seven hundred dollars; and for expenditures charged by him to the "Cherokee Reservation," and made previous to the sale, they ought not any of them to be allowed, because they are not legally chargeable against the United States. In the first two expenditures Mr. Duval was allowed certain sums by the United States, which he received and expended; he has no right to ask more from them; the land belonged to the Cherokees; all that Mr. Duval expended on it, whether on the buildings in addition, or in improvements, was for them and they must pay him; he had no lien on the land; it was sold by the United States under the treaty and the proceeds paid over to the Cherokees; if the sale was incorrect or imperfect it is to be sold again, and if it brings more the surplus must be paid to them also; but until actually sold it was or is the property of the Indians, and to them Mr. Duval must look for repayment. The same principles are to be applied by the jury in

considering all the other items, except the last, which falls under the class of contingencies; the rest, which are matters of proof, must depend entirely on the evidence. As to the twenty-fourth item, the law is too clear to admit of doubt; it requires expressly that every credit claimed shall have been disallowed; this has not been done; a suspension is not a disallowance; a suspension followed by a suit for a balance which includes the sum suspended, might be an implied disallowance; but a sum presented, suspended, and not embraced in the amount claimed on suit by the United States, is not a disallowance either express or implied; on the contrary, it leaves the inference that the claim is believed to be just, and will be admitted on proper proof being produced, for which time is now given.

HOPKINSON, District Judge (charging jury). It is more than two weeks, that your attention has been closely and patiently given to this interesting and complicated cause, in which an endless variety of facts, intermixed with questions of law and usage, is involved. The long account which has been spread before you, contains twenty-four principal items which are disputed, and which again are subdivided so as to amount to nearly one hundred subjects of controversy. It is now my duty to present to your consideration such views of the case, as I may believe will assist you in making up your verdict. I might, perhaps, perform this duty with more order and in a better shape, by postponing the charge until to-morrow; but I have determined to proceed with it at once, while the evidence and arguments are more fresh in our recollection than they may be twenty-four hours hence. The items for which the defendants now claim a credit have been rejected by the officers of the treasury at Washington, and, as to some of them, the refusal is justified by insisting upon the usage of the department in settling such accounts. You will understand that an usage, which is to govern a question of right, between parties in this court, must be so certain, uniform, and notorious that you may say that it was understood and known to the parties. In such a case we cannot say that it is allowed to change or control the contract between them, but rather that it is a part of the contract, and was so understood, and, of course, is as binding upon them as any other stipulation in it. The usages of a department of the government in settling an account with an individual, unless it be such a one as I have described, can have no influence here.

There is another question of somewhat the same character, upon which it is proper I should be very explicit with you, and if I am mistaken in my view of it, the dissatisfied party has the means of correcting my error. It has been repeatedly and ardently urged upon us, by the district attorney, that as to certain charges in this account, that is, those which are embraced in or applicable to what is called, "the contingent fund," the decision upon them by the secretary of war is final and conclusive, that his decision may not be reversed and disturbed here, and that in case of hardship or injustice in the refusal to make allowances to a public agent for such charges, congress only can grant relief. I entirely and distinctly dissent from this doctrine, although we are assured that such is the understanding and practice of the war department, and the treasury officers at Washington. If this cause comes to this court and jury trammelled, nay decided, by the judgment of the secretary of war, to what purpose has the party a right to bring it here; the trial is an unreal mockery, and you and I are the mere automata of a stronger hand, the agents to execute the decree of a higher power. I say to you, that in every case where the law of congress allows or refuses a charge in the account of a public agent, the secretary, as well as you and I, are bound by that law and must conform ourselves to it; but that in the cases where the law is not imperative, but confides to the secretary an authority, a discretion to allow or disallow a charge, as he may deem it to be just and equitable, or otherwise, then when the cause comes to this court for revision and examination, the court and jury have the same discretion and authority over such charges as the secretary had in the first instance, and we may exercise our judgments upon them in allowing or disallowing them, as we may think justice and equity demand. The opinion of the secretary will have the influence to which his character and station entitle him and no more. As an authority it is nothing.

I should be diffident of using this language to you if I were not supported in it by the highest judicial tribunal of our country. I understand the doctrine of the supreme court to be such as I have given it to you. Let me repeat it. When a certain charge is prohibited to a public agent by the law under and by which he is appointed, the allowance of such a charge would be a violation of the law, which is not permitted either to the court or the head of a department. But when there is no such prohibition, but the objection or defect is the want of an express authority for it, and it is therefore not a subject of strict legal right, yet nevertheless if it is supported by a clear equity arising from a bona fide performance of a service, or the bona fide expenditure of money for the public service, there a discretion is properly and indeed necessarily vested in the head of the proper department to allow the charge. If it were not so the consequence would be, either that the service and interests of the government would often suffer, or that a meritorious officer would be ruined by his fidelity and zeal. Whenever and wherever the head of a department may exercise his discretion upon such a charge, and in the use of that discretion, has refused

the allowance, and the court and jury before whom the case shall come for trial, think that the secretary ought to have made the allowance, they may do it. This doctrine is sustained by the supreme court in the cases of U. S. v. Macdaniel, 7 Pet. [32 U. S.] 12, in that of U. S. v. Ripley, Id. 25, 26, and in that of U. S. v. Fillebrown, Id. 48. I hold then that you are not bound by any thing the secretary, the comptroller, or the auditor has done with the charges in this account, be they contingent or not contingent.

We must now make a review as brief as possible, of the particular subjects of controversy in this cause. The treasury transcript, which is primâ facie evidence of the indebtedness of the defendant, shows a balance due from him to the United States of eleven thousand five hundred and thirty-eight dollars and seventy-five cents. This stands good against him, unless he can extinguish or reduce it by showing that he has just claims or is entitled to credits which have been refused in the settlement of his account at the treasury. He has presented to you certain claims and credits which were not allowed at the treasury, and you are now to decide whether they ought to have been allowed; whether they are such as the justice of his case entitled him to. (The judge took up the several items in their order, recapitulated the evidence, and made his remarks on each of them. It is only as to some of them that it is thought now necessary to repeat his observations.)

Item 2. This is for charges of an Indian treaty at Washington. It consists of two parts: (1) His expenses. This was allowed at Washington. (2) For his services in negotiating the treaty. He had no appointment as a commissioner for that purpose; but did he render the service of one? It is proved that he did, and that his services were indispensable to the success of the negotiation. Did he volunteer his services? If he did, he is not entitled to this charge; but it is proved that he acted by the request of the secretary of war, and that he did the duties of a commissioner. It was an extra service, not within the line of his duty as an Indian agent. His compensation should be what is allowed in similar cases, for the same services. If he did the duties of a commissioner, he is entitled to the compensation of one.

Item 8. This is a charge of eleven hundred and twenty-five dollars, paid by the defendant to one Thomas Graves, for damages for spoliations. The treaty appropriated eight thousand seven hundred and sixty dollars, for spoliations committed on the Cherokees; also a further sum of twelve hundred dollars for Graves; also five hundred dollars for one Guest, and five hundred dollars for one Rogers. All these sums were put into the hands of the agent to be distributed according to the terms of the treaty. The agent, it is not doubted, paid to Graves the money due to him; but it appears that the government also paid it to Rogers, on an order drawn by Graves.

It has thus been twice paid. Who is to bear the loss? The party on whom the fault rests; the party who incautiously made the payment. The money was given by the government to Duval as their agent, to be paid by him to Graves; he therefore not only had the authority to pay it, but it was his duty. He did pay it honestly and in good faith, on the order of Graves, in several sums at different times ending in 1830, and part of it was paid by Mr. Murray after the death of Mr. Duval. After Graves had thus given orders on Mr. Duval for the whole amount due to him, which orders were paid without a suspicion of fraud, he most dishonestly gave an order on the government to Rogers for twelve hundred dollars, which was presented by Rogers and paid to him by the government. Now is there any doubt where the fault, the want of due caution, was? When this order was presented, the government well knew that the whole amount to be paid for spoliations, of course including that due to Graves, had been put into the hands of their agent, Mr. Duval, to be by him distributed to the persons entitled to it. Yet without making any inquiry why this order was drawn on them, why Mr. Duval had not been applied to, or if he had, why he had not paid it, or whether it was or was not paid, they accept and pay the order thus fraudulently drawn, and as to which the fraud would have been detected by the exercise of the most ordinary prudence. This is not all; Graves had another claim for one hundred and seventy-five dollars, under the general appropriation for damages, by the same treaty, but the specific appropriation only was put into the hands of Mr. Duval. The claim for one hundred and seventy-five dollars, which if due was properly drawn for on them, was refused, while the other was paid. The only ground taken now for refusing to Mr. Duval the allowance, is that the payments made by him, on the orders of Graves, were not presented in the settlement of Mr. Duval's account of 1830 and 1831. This is doubtful. Mr. Murray swears that they were then presented; the auditor says they were not; of the fact you will judge; but whether they were or were not, the defendant has a clear right to the allowance.

Item 13. This is a charge of six hundred and seventy-nine dollars and sixty cents for erecting the agency house. Some important questions are involved in it. In 1827 a house was purchased by Mr. Duval for seven hundred and fifty dollars, with the site. It was but a log cabin with a frame store house. The new building, erected about two miles and a half from the old one, cost with the seven hundred and fifty dollars paid for the old one, the sum of two thousand six hundred and seventy-nine dollars and sixty cents. The agent had distinct orders not to exceed the sum of two thousand dollars for this object; he was expressly limited to that amount. He now presents a charge against the United States for six hundred and seventy-nine dollars and six-

ty cents, the excess of his expenditure beyond his orders. The disbursements are said, by the witness, to have been made with economy. But will this justify the agent for disregarding his orders and exceeding his authority? Nothing can be more dangerous than the admission of such a principle. It is like any other case of principal and agent. The agent of the United States stands bound by the same law, as the agent of any individual. In both cases the question is: has he exceeded his instructions clearly and distinctly given, in which there is no equivocation, and nothing left him but to obey? If he has, he must answer for it; all he has done beyond his authority is of himself and for himself, and he must take it upon himself. It is not like the case where an agent, having no specific instructions, and being called upon to act, exercises a sound and honest discretion. In the face of clear and positive orders, there is nothing for discretion to decide. It is pretended that the limitation of two thousand dollars had reference only to the building of the house, and not to the purchase of the land. The purchase of the house necessarily included the land on which it stood. The whole expenditure for an agency house was not to exceed two thousand dollars. In purchasing the reservation, on which this house stood, the log cabin and frame store were valued at four hundred dollars, and the ground at three hundred and fifty. To this seven hundred and fifty he had a right to add thirteen hundred and fifty for bettering the accommodation, and no more. He has exceeded this amount by the sum of six hundred and seventy-nine dollars and sixty cents, which he now claims from the United States. I think he is not entitled to it.

Item 14. This was a charge for expenditures in erecting a cotton gin and gin house. These improvements were erected partly in 1827, partly in 1828, and not completed until 1829. The government had allowed the agent to expend the sum of seven hundred dollars; but he had expended beyond that amount eleven hundred and seventy dollars and ninety-four cents, which he now charges to the government. He was allowed the seven hundred. The witness, Mr. Murray, testified that the sum allowed was not sufficient to erect a suitable house. The cotton gin was in the reservation, and was included in the sale of that land. This excess of his authority and orders can hardly be justified. If he found the sum allowed too small, he should have so represented it to the government and waited for new instructions. The excess was not trifling; it was nearly three times the amount allowed. The defendant did not claim this allowance, but gave it up as not chargeable to the government. But there is another view of this charge, which seems to me to exclude the defendant from any claim upon it. By a treaty with the Indians on the 6th of May, 1828, they made a cession of certain territory to the United States, with a special reservation of a part of it. By this reservation, the part reserved with all the improvements on it, was agreed to be sold by the United States, and the proceeds of the sale were to be applied to the benefit of the Indians on the new territory to which they removed. The cotton gin and improvements in question were erected upon this reserved part, and of course were to be sold with it. The sale was accordingly made. The proceeds were the sum of two thousand and fifty dollars, which were fully and faithfully applied to the use of the Cherokees, in conformity with the agreement. This sum was the proceeds of the land and of all the improvements on it, and of course, when the United States paid over this sum to the use of the Indians, they paid the value of those improvements as well as of the land. It is now contended that the government must pay the defendant for these same improvements; thus paying for them twice; once to the Indians, for whom they were erected on their own territory, and again to the defendant, who had erected them at his own hazard, so far as he exceeded his authority in their cost. Nor has the defendant any reason to complain: he is only sent back to the persons for whom and on whose credit, to wit, the Cherokees, he made these improvements. He had no idea that the United States were answerable to him for them: so he says in his memorandum of the 20th of May, 1828. If he were living we cannot suppose he would make this charge. Mr. Duval was himself the purchaser of the land, with the improvements, at the public sale. It is true that this sale was afterwards cancelled by an agreement between his representatives and the United States, by which he transferred his right to them, on the ground that he, being the Indian agent, could not be the purchaser at such sale; but I do not see that this circumstance gives any equity to this charge which can address itself to this court and jury. If his purchase was illegal and void, by reason of his agency, he gave up nothing by cancelling it, or by the transfer of his right to the United States. If his purchase was legal, the surrender was voluntary and without condition. If his representatives intended to charge the United States, on account of this transfer, with this debt, in addition to the amount which the land sold for, they should have said so, and made it a condition of the transfer. The only consideration which appears to have been given by the United States, or asked by Mr. Duval's representatives, is the repayment to them of the sum of two thousand and fifty dollars, which he had given for it at the sale. Now they would add nearly twelve hundred dollars to this consideration, without any notice of any such intention or expectation. Suppose this sale or transfer by them had been made to one of you; would you expect to be called upon to pay, not only

the stipulated price or consideration, but also to discharge an old debt, not charged upon the land, which the Cherokees owe to Mr. Duval for the very improvements included in your purchase and paid for by you? I am very clear that this charge ought not to be allowed, but that the Cherokees, the original debtors, at whose request, on whose credit, and for whose use the improvements were made, must be looked to for payment. They have indeed received compensation for them in the price paid to them on the sale of the land with them.

Item 15. This charge must also be disallowed. These expenditures were made on the land, when it belonged to the Indians, or at least they had the beneficial interest in it. They were on the tract reserved for the benefit of the Indians. Mr. Murray, the witness of the defendants, who was connected with the agency as the clerk of the agent, and a member of his family, expressly says, that he believes Mr. Duval considered the Cherokee Nation as responsible to him for this expenditure; that he considered the whole matter to be between the Cherokees and himself, and not with the government. Indeed the charge is not to the United States, but to the "Cherokee Reservation." Mr. Duval never presented the charge to the government in his life time.

Item 24. This is a charge of fourteen hundred and twenty-seven dollars and seventy-five cents, for expenditures on the Cherokee reservation. The counsel for the defendants states that these expenses were made on the land, after the purchase of it by Mr. Duval, and while he thought it his own; afterwards the sale to him was cancelled, and the land, with these improvements, transferred to the United States, the secretary of war saying that Mr. Duval, being the agent of the government, was prohibited from purchasing. The United States having thus taken these improvements ought to reimburse Mr. Duval for them; he made them believe that he had a right to the land. But we are precluded from taking this charge into our consideration. We need not therefore take into our consideration the objections that are made to it, to wit, that it has no date, no signature, no bills or receipts, nor any thing to prove the expenditures for which a reimbursement is claimed. The preliminary difficulty is that this charge has never been presented to the department for their allowance or disallowance. It has of consequence never been rejected by the accounting officers of the treasury. By the fourth section of the act of congress of March 3, 1797, it is enacted that in suits between the United States and individuals, no claim for a credit shall be admitted upon the trial, but such as shall appear to have been presented to the accounting officers of the treasury, for their examination, and by them disallowed, in whole or in part. This has not been done, at least it does not appear that it has. No disallow-

ance of this item appears any where here. It has been assimilated to some items which have been suspended though not absolutely disallowed, and yet have been the subject of examination on this trial. I answer: (1) That no objection was made to them by the officer of the United States, who has appeared for them on this trial, and has their rights in his charge; and at most the argument could only prove that the suspended item ought not to have been inquired into, but does not prove that this may. (2) But I think that it does now appear that these items, although at first only suspended, are now disallowed, because the suit brought by the United States, claims a balance which necessarily excludes these items. No particular form of allowance or disallowance were required by the act. It is enough if it appears that they are disallowed.

The jury found a verdict in favour of the United States for the sum of three hundred and forty-eight dollars and twenty-nine cents. At the time of giving their verdict they presented a paper to the court, in which were stated those items of account in dispute that were allowed, and those that were rejected by them. From this it appeared that they had refused Mr. Duval a credit for items 7, 13, 14, and 24, altogether; and also for that part of item 2, which consisted of a claim for compensation; that part of item 19 which consisted of the materials used by McDavid, the blacksmith; and that part of item 20 which consisted of an allowance to Flower for his services as a commissary. All the remaining items claimed by the defendants were allowed.

On the 24th of June, 1833, the district attorney moved for a new trial, and filed the following reasons: (1) Because the jury allowed the claim of the defendants for one hundred and forty-seven dollars and fifty cents, including one hundred and ten dollars for the loss of a horse of the said Edward W. Duval, although the defendants were not entitled by law to such allowance; although there was no evidence that the loss of the horse was occasioned by his being employed in the service of the United States; and although the court charged that they were not entitled to such allowance unless such loss was so occasioned. (2) Because the jury allowed the claim of the defendants for three hundred dollars, for disbursements made by the said Edward W Duval to an interpreter at Washington, although the defendants were not entitled by law, to such allowance; although there was evidence, that the said interpreter was not entitled to the same for any services rendered by him, that the allowance was not claimed by the said Edward W. Duval in his life time, and that it was not paid till after his death; and although the court charged the jury unfavourably to such allowance. (3) Because the jury allowed the claim of the defendants for

four hundred and sixty-six dollars and sixty-four cents, for forage of horses of the said Edward W. Duval, for four years and upwards, although the defendants were not entitled by law to such allowance; although there was evidence that the said Edward W. Duval never claimed the same in his life time; and although the court charged the jury unfavourably to such allowance. (4) Because the jury allowed the claim of the defendants for two hundred and seventy dollars and thirty-five cents, for disbursements made by the said Edward W. Duval on the property called the "Cherokee Reservation" before its sale, although the defendants were not entitled by law to such allowance; although there was evidence that the disbursements were made at the request of the Cherokees for their own benefit, and on the understanding by the said Edward W. Duval that they were to be paid for by them; and although the court charged the jury against such allowance. (5) Because the jury allowed the claim of the defendants for eight hundred and thirty-seven dollars and fifty cents, including disbursements made by the said Edward W. Duval to James McDavid for the board and wages of a striker, although the defendants were not entitled by law to such allowance; although there was evidence that the same had been included in previous payments; and although the court charged the jury unfavourably to such allowance. (6) Because the jury allowed the claims of the defendants for thirty dollars and twenty dollars, for travelling expenses of the said Edward W. Duval, although the defendants were not entitled by law to such allowance; although there was evidence that the said Edward W. Duval never claimed the same in his life time; and although the court charged the jury unfavourably to such allowance. (7) Because the verdict of the jury was against law. (8) Because the verdict of the jury was against the evidence. (9) Because the verdict of the jury was against the charge of the court.

On the 10th of September, 1833, the motion for a new trial was argued by Mr. Gilpin, District Attorney, for the United States, and Mr. Sergeant, for defendants.

Mr. Gilpin, U. S. Dist. Atty.

It is unnecessary, and would be improper in this stage of the cause, to renew the argument on the points of law submitted to and decided by the court, after so full an opinion as that expressed in the charge to the jury. This application is, therefore, limited to those items on which the verdict was in opposition to the opinion or direction of the court; in which it was against the law as laid down in the charge, or against the weight of evidence. The statement presented by the jury, at the time of rendering their verdict, enables us to discover these without difficulty, and to ascertain exactly in what points their final decision was erroneous, on either ground. The first objection arises from their allowance to Mr. Duval for the loss of his horse in going to an Indian council, which forms part of the sixth item. This was against law, because it was not established by the evidence that the horse was lost on account of its employment in the service of the United States, and no allowance is lawful except for such a loss. The law fixes the entire compensation of the agent at fifteen hundred dollars per annum, in which his necessary expenses are included, and all the evidence of any customary allowance goes at most to cases where the horses are specially employed for the public service. The charge of the court was in accordance with this view, declaring expressly that the loss must be occasioned, not merely in such service, but by it. The second objection is to the allowance of the eleventh item, for the services of an interpreter to the Indian delegation. This is altogether illegal; it is for services rendered to the Cherokees, and as long since as 1828, there was a regular interpreter to the delegation who was paid by the United States; and this charge never seems in any manner to have been contracted for or allowed by Mr. Duval himself in his life time. Though undoubtedly questions of fact are to be left to the jury, yet this is a decision so much against the weight of evidence, that it affords quite sufficient ground for the exercise of the right to grant a new trial. Kohne v. Insurance Co. of North America [Case No. 7,921]; Smith v. McCormick, 2 Yeates, 164; Swearingen v. Birch, 4 Yeates, 322. The third objection is to the allowance of the twelfth item for the forage of Mr. Duval's horses, which was never claimed by him at all during his life, and is now brought forward by his representatives in one general charge, extending back several years before his death. The evidence of Messrs. Stewart and McKenney, adduced by the defendants to prove the usage of the war department, at most, sustains allowances for a special or temporary employment of horses by an agent, never an annual allowance. This is a regular charge per annum for nearly five years. It is in direct opposition to the charge of the court, and is unsupported by any evidence. The fourth objection is to the allowance of the fifteenth item, the expenditures on the Cherokee reservation before its sale. These expenditures were incurred on the property while it belonged to the Indians; the improvements were made at their request, charged to them in the accounts of Mr. Duval, and, as he himself stated to the department, were to be paid by them. The fifth objection is to the allowance of that part of the nineteenth item, which embraces the board and services of the assistant or striker of the blacksmith, employed at the agency. This was clearly against the evidence. It was proved that the assistant was his own slave, and that the claim was carried back for several years, though intermediate bills had been paid, but

this charge was included in none of them. The last objection is to the allowance of the twenty-third item, which consists of a charge for Mr. Duval's own travelling expenses. This, like the preceding claims of a similar kind, is properly embraced in the salary of an agent; it was for ordinary expenses on official and necessary business; it was not charged by Mr. Duval during his own life; and no evidence has been produced that he ever considered it as a ground for a special credit.

(THE COURT intimated to the counsel for the defendants that it was unnecessary to argue the first, second, fifth and sixth objections; and, understanding that they were willing to give up the verdict so far as it allowed the amount of the fifteenth item, for expenditures on the Cherokee reservation, he was directed to confine his reply to the third reason on behalf of the United States for a new trial.)

Mr. Sergeant, for defendants.

The argument in support of this objection involves the point of law asserted by the district attorney on the trial of the cause, that the sanction of the secretary of war is necessary to authorise the allowance by the court and jury of the claim presented. The court have already overruled that ground, and the only question which the jury had to consider, in regard to this allowance, was, whether these horses were necessary to the service of the United States. It never could be the rule of the department that, where an emergency arose, the agent was not to meet it; that he was first to send to Washington; on the contrary, it is necessary and proper that he should be at liberty to exercise a reasonable discretion. It appears from the evidence of Col. McKenney, that there was no positive rule on the subject, but that where an agent was called on to perform unexpected but necessary services, an allowance was made suitable to the circumstances; he adds that horses are necessary for the agent; that when kept for the use of the United States, the expense was allowed, and that two, the number for which this forage is claimed, are reasonable. The defendants have proved, by the evidence of Mr. Murray, that these horses were used only for the public service; if, therefore, the expense of keeping them is refused, the indispensable business of the United States will have been performed, at the expense of Mr. Duval and his representatives. But this, at any rate, is not a ground for a new trial; the whole matter, as to law, usage and fact, was fully submitted to the jury; it was contested at large by the district attorney; and it was specially discussed by the court in the charge. It was allowed because it was an expense bonâ fide incurred, of which the United States derived the benefit; and believing this, the jury were right in allowing it. It is immaterial whether it was

claimed or not during the lifetime of Mr. Duval; if the jury were satisfied that he was justly entitled to it, they acted as properly in giving it to his representatives, as they would have done in giving it to himself, had he lived.

Mr. Gilpin, U. S. Dist. Atty., in reply.

The verdict of the jury on this item is sustained, because, as is alleged, the usage of the war department admits such an allowance, because these horses were for the express service of the United States, and because it is altogether immaterial whether the claim was made before or after the death of Mr. Duval. The evidence of Messrs. Stewart and McKenney, officers long in the Indian department, does not establish an allowance under circumstances exactly similar; the instances they cite differ from it in a material point; they refer to horses used on special occasions, on emergencies, and for particular objects, while this is an annual and permanent charge. It is true they were employed in the service of the United States, but all the agent's expenses, as such, were equally incurred in their service: this is not enough, it must be shown that they were in some unusual, extraordinary service, which has not been done. This fact makes the time and manner of presenting the charge material: had it been a subject of special expense or charge, it would have been presented by Mr. Duval; and his omission to do so, during his life, affords strong ground to conclude that he did not consider the case as one falling within the line of special allowance, to which the witnesses above named have referred, and which undoubtedly was well known to Mr. Duval.

HOPKINSON, District Judge. When a controversy, consisting almost entirely of questions of fact, has been fully and fairly tried by an impartial and intelligent jury, each party having produced all the evidence in his power, and no expectation being entertained by either of furnishing any additional facts, a court would yield, with extreme reluctance, to an application to set aside the verdict. The cause now before us occupied the attention of this court, and such a jury as I have described, for more than ten days, and every part of it was laboriously examined and discussed. There is no hope that anything can be added to it, either in the way of argument or evidence, on another trial. In such a case the objections to the verdict should be cogent indeed, before the court would allow them to prevail against it. In addition to this general principle, there are circumstances in this case which make me very unwilling to disturb the decision of the jury. The controversy arose on a long and old account, in relation to transactions in a distant wilderness, in part with savages, and in part with men not much above them in education and a knowledge of the forms of business. The

transactions themselves were sometimes the result of sudden emergencies, when the public service required a prompt action, and an observance of exact regularity was impossible without danger to the service. It is obvious that in such an agency, it would scarcely be just or reasonable to call for, at this distance of time as well as place, a full and satisfactory explanation of all the doubts and difficulties which may present themselves here, in the investigation of these complicated affairs, and of the various items, some of them very small, which are brought into the account. Unfortunately one of the parties, from whom such explanations might have been received, is dead, and his representatives have been obliged to make up his case from his papers as they found them. Such a case seems to be peculiarly fitted for the broad and equitable jurisdiction of a jury over the evidence of a cause, and the belief they will give to it. It should not be altogether overlooked, too, on a question of granting a new trial, addressed to the discretion of the court, which discretion takes for its guide the justice or injustice to the parties that will follow the allowance or refusal of a second trial, that, in this case, the defendants have relied, and must always rely, on the knowledge and testimony of a single witness; that he lives at an immense distance from this place of holding the court, and was, probably, brought here at a great expense; that his presence can hardly be expected again; and that his evidence was of a nature to require a personal examination at the bar, and could not be taken with satisfaction to either party in any other way. Such circumstances would strongly dispose me to let this verdict stand, although in some instances the jury have not drawn the same conclusions from the evidence that I should have done, and have made some allowances to the defendants, which I should have refused, were I not, on a careful review of the disputed items of this account and the decision of the jury upon them, constrained to say that I find some in which the jury have, in my opinion, rendered their verdict against the plain principles of law, or against the clear and unquestioned evidence of the case. Such errors I am bound to correct, and must be governed by higher considerations even than those which I have stated in support of the verdict. The court must never suffer its controlling power over a verdict to be prostrated, nor the particular circumstances or even the justice of any case, to overthrow the general principles established for the adminstration of the law, and the security of the rights of all.

The motion for a new trial in this case is made on the part of the United States. The reasons filed, exclusive of the general or formal ones, are six in number. The first, second, fifth, and sixth, relate to the allowance by the jury of certain disputed credits claimed by the defendants in their account, as to which there was evidence given both for and against them, and they were left by the court to the jury on their evidence and equity. Upon these I shall say no more than that I cannot interfere with the opinion of the jury in such cases. As to the fifth, the most important of them in amount, I will remark that the disbursements here charged to the United States were actually made and paid by Mr. Duval to the blacksmith James McDavid. The objections made on the part of the United States to the right of McDavid to this money, or, at least to that part of it which he charged for his striker, are very strong and have not been well answered or explained; but, on the other hand, as no pretence is made of any fraud or collusion between Mr. Duval and McDavid, and the propriety of the charge itself is not so absolutely disproved as to fix upon Mr. Duval an imputation of gross and culpable negligence, and he actually paid the money, I cannot say that the jury were wrong in allowing it. Why should Mr. Duval have paid this money to McDavid if he did not think it honestly due to him? He knew he took the hazard on himself of its being allowed to him or not in the settlement of his account. To the general remark I have made on the first reason, which relates to the loss of a horse, I will add that the witness said he knew the horse died in the service which brought the charge within Mr. Stewart's rule of allowance: but I told the jury that if they thought the horse died in consequence or by reason of the service, the charge should be allowed, but not if the loss was owing to the fault or negligence of the owner, even if the horse was in the service at the time. As to the three hundred dollars paid to Pierre Perra as an interpreter at Washington, which is the subject of the second reason for a new trial, I am free to say that I should not have allowed it, and I gave my reasons for this opinion to the jury; but they have thought otherwise, and I cannot say that they had not a right to do so. It was, in my mind, a strong circumstance against this charge, that the money was not paid by Mr. Duval to Perra, nor, as far as I recollect the evidence, ever demanded of him by Perra. It was paid since the death of Mr. Duval, one may almost say gratuitously by his administrator, and three years after the service was performed for which it was demanded. The service was in 1828, the payment in June, 1831. Such things certainly cast a shade over the charge, but the jury have been satisfied that it is correct, and their decision upon it must stand.

The two items, on which I have not been able to find a satisfactory support for the verdict, are the third and fourth. The fourth has not been argued on this motion, because it is understood that the defendants will con-

sent to correct the verdict by adding to it the amount of this item, to wit, two hundred and seventy dollars and thirty-five cents. It arose on a claim made by Mr. Duval for disbursements for improvements on the property called the "Cherokee Reservation," before its sale. Such a charge upon the United States for disbursements on property not belonging to them, but of which both the title and possession were in the Cherokees, was directly contrary to every principle of law, charging one party for improvements on the property of another. Nor did Mr. Duval himself ever consider this an expenditure chargeable to the United States, or introduce it into any account against them. The charge was to the "Cherokee Reservation." Mr. Murray, the defendants' witness, who was the confidential clerk of Mr. Duval, and from whom we have derived all our knowledge of the transactions of his agency, says expressly, that he believes Mr. Duval considered the Cherokee Nation as responsible to him for these improvements; that he considered the whole matter to be between the Cherokees and himself, and not with the government. This allowance of this charge against the government, is as much against the evidence as the law of the case. As the counsel for the defendants have given up this part of the verdict on my suggestion, at the argument, I owe it to them to explain more fully the reasons of my opinion. By the treaty of the 6th of May, 1828, the Cherokee Indians made a cession of territory to the United States, with a special reservation of a certain part of it. In relation to this it was stipulated that the part reserved, with all the improvements on it, should be sold by the United States, and the proceeds of the sale be applied to the benefit of the Indians on the new territory to which they removed. The sale was made. Mr. Duval was the purchaser at the price of two thousand and fifty dollars; this he paid to the United States, and they appropriated it, according to their agreement, for the benefit of the Indians on their new territory. This sum, so received and so applied by the United States, was the whole proceeds of the sale as well of the lands included in the reservation as of all the improvements made thereon, for which improvements the sum of two hundred and seventy dollars and thirty-five cents, now claimed by the defendants, was expended by Mr. Duval, while the land belonged to the Indians, at their request and on their credit and responsibility. It is now contended, or was so at the trial of this cause, that the United States must not only pay to the Indians the proceeds of their land and improvements, but must further pay a debt they owe to Mr. Duval on account of those improvements, that is, in fact they are to pay twice for them, once by handing to the Indians the whole amount they brought at a public sale, and now again by paying for them to the person at whose cost they were made. When Mr. Duval made these improvements he did so on the credit of the Cherokees, and had no idea of having any claim on the United States for them.

When Mr. Duval made the purchase of this reservation he was the agent of the United States to these Indians. It was, since his death, on a suggestion of the illegality or impropriety of his being a purchaser at this sale, surrendered by his representatives to the United States, and they received back the money he had paid for it. Does the agreement with the United States to cancel this purchase, and the transfer of his right to the United States, raise an equity to support this claim, because the land and the improvements thereby became the property of the United States? I can see nothing in this arrangement which raises an equity against the United States for the charge in question. If the purchase made by Mr. Duval was illegal by reason of his agency, his representatives gave up nothing when they cancelled it, and made the transfer to the United States. If, on the other hand, the purchase was legal and their right to the land complete, the surrender of it was a voluntary act, made freely and without condition, or any intimation of receiving any thing more from the United States than a return of the money Mr. Duval had paid for it, which, it may be, was better for them than the land. If it was the intention of the representatives to claim any more, either directly or as a credit in their account with the government, they should have said so, and the United States, the other party to the bargain, could have said whether they would assent to it or not. The only consideration that appears in the agreement, the only one that was recognised by both of the parties, or even thought of, as far as we know, by either of them, was the repayment of the sum of two thousand and fifty dollars, which Mr. Duval had given for the land. If an individual, instead of the government, had made this agreement with Mr. Duval, and had paid him the stipulated consideration, could he have been afterwards charged with an old debt which the Cherokees owed to Mr. Duval, for the same improvements on the land which were paid for in the sum of two thousand and fifty dollars, given for the whole? I told the jury that I was very clear that this item ought not to be allowed, on any principle of law or equity, and it is as clearly against the evidence.

The matter alleged for a new trial, in the third reason, requires a fuller explanation of the evidence which relates to it. It is thus stated: "Because the jury allowed the claim of the defendants for four hundred and sixty-six dollars and sixty-four cents for forage of horses of the said Edward W. Duval for four years and upwards, although the defendants were not entitled by law to such allowance; although there was evidence that the said Edward W. Duval never claimed the same in his lifetime; and although the court charged the jury unfavorably to such allow-

ance." The charge or credit, claimed by the defendant in this item, is for foraging two horses from the 1st of January, 1826, to 31st of August, 1830. In the examination of Mr. Murray, the witness of the defendants, to support this charge, he says, that these horses were employed in the service of the United States, and were necessary for it. He thinks the charges are moderate. They were Mr. Duval's horses; he had his farm horses besides; these were kept for public service, such as travelling through the Nation, and to send expresses. He says, he knows of no such allowance to other agents. Mr. Duval had not the same horses all the time. He knows of no authority from the secretary of war to Mr. Duval to keep these horses.

On this evidence, given by the defendants to support this claim, these observations present themselves: (1) That the charge is for a period of four years and eight months; during which period, nor, indeed, at any time in the lifetime of Mr. Duval, was any charge for keeping these horses introduced by him into his accounts sent to or settled with the department, nor any claim made for it in any way by Mr. Duval. This circumstance affords some ground, I might say strong ground, to presume that he never considered it a charge which he had a right to make, or intended to make, against the government, and it stands, in this respect, on a similar footing with the charge for the improvements on the Cherokee reservation. (2) If these horses were really kept for the public service, and were necessary for it, and were so thought and intended by Mr. Duval, the cost or purchase of them would have been, at least, as fair a charge upon the government as their forage; but they were Mr. Duval's horses, bought with his private funds, and no reimbursement of their price was ever asked by Mr. Duval, or is even now asked from the United States. This is another circumstance to show how this transaction has been understood by Mr. Duval himself. (3) The same horses were not kept through the whole period, but no account is raised with the United States for the sale or the loss of the horses he parted with, nor for the purchase of their substitutes. (4) This is a regular, continued charge for a long period, and not for horses required or employed, from time to time, in the public service, on emergencies which allowed no opportunity to consult the department at Washington, and obtain the permission of the secretary for the expenditure; nor do they appear to have been procured or wanted for any such emergencies, but to have been used for travelling through the Nation or in sending expresses, in the performance of the ordinary duties of the agent.

Before we take up the evidence of Mr. Stewart and Col. McKenney on this subject, let us turn to the act of congress which has a direct bearing upon it, and whose provisions, we must presume, were found to be necessary to prevent or restrain abuses upon

the treasury, in the undefinable shape of extra allowances, which might grow out of these agencies without the means of detecting or checking them in detail. By the first section of the act of April 20, 1818, the salaries of the several Indian agents are appointed; and by the third section it is enacted: "That the sums hereby allowed to Indian agents and factors shall be in full compensation for all their services; and that all rations, or other allowances made to them, shall be deducted from the sums hereby allowed." The legal rights or claims of an agent upon the United States are thus circumscribed by the law, but there exists in the war department a power to make allowances to an agent, unprovided for by law, when the secretary shall think them to be just and equitable, and not forbidden by any law. Under this power, certain usages have grown up in the department, which have become the law of the department, and on which an agent has a right to rely, in the exercise of his functions. That which has been uniformly allowed to others, he may presume will be allowed to him, and if he performs a service, or makes an expenditure of this description, he has a right to expect an allowance for it. The defendants have endeavoured to bring the charge we are now considering, within the protection of the usage of the war department. To effect this they have produced the testimony of William Stewart and Col. McKenney. Mr. Stewart has been a clerk in the war department from 1818 to 1832; he says it has been invariably the custom to allow salary officers extra for services not within the scope of their offices. He mentioned the case of Governor McMinn, who received eight dollars a day and other allowances, as a commissioner to value the improvements of the Cherokees, and received at the same time his salary as governor. In this case it is evident that the appointment as a commissioner was entirely distinct from that of governor; the duties of the stations were wholly independent of each other. The service as a commissioner was clearly not within the scope of his office of governor. It is no example or precedent in this case. So of the case of Col. McKenney. In 1827, this gentleman, then at the head of the Indian bureau of the war department, whose office and duties were at Washington, was sent by the government among the Indians to make treaties, and to reconcile some differences among the Creeks. He acted as a commissioner in forming a treaty, and received pay as a commissioner for the time he was treating, and his travelling expenses, and, at the same time, his salary as superintendent of the Indian bureau. This case is analogous to that of Governor McMinn, but not to the charge made on behalf of Mr. Duval. I am aware that this part of Mr. Stewart's testimony was applied more particularly to other charges in the defendant's account than to this; but as it may have some bearing on

this also, I have made this reference to it. In relation to this item, to wit, the foraging the horses, this witness says, that no allowance was made for keeping horses, unless specially agreed upon by the secretary. If a horse is wanted for an emergency requiring prompt execution, as expresses, there is a discretionary power with the agent to employ one, but, in general, no allowance was made for horses, unless specially authorized. When this witness gives the example of expresses, he must be understood to mean an express on an emergency requiring prompt execution, and not an ordinary message sent on ordinary business.

In the case of Col. Crowell, given by this witness, the question was deliberately considered. He was the agent of the Creek Indians, and brought a charge of two hundred and fifty dollars a year for horses, for the use of the agency, for four or five years. It was allowed by the then acting secretary of war. This was in 1828. He was also allowed for the cost or purchase of the horses. Thus he carried the whole thing through as the concern of the government, charging them for keeping what he alleged to be their horses, bought and kept for the use of the agency; and not, as in this case, for keeping horses admitted to be his own. The comptroller, in settling Col. Crowell's account, refused to pass this charge; and so it remained suspended, until it was finally, within the last eighteen months, rejected by the secretary of war. This seems to have settled the practice or usage of the department, or to have been in conformity with it, for, the witness says, several agents brought in similar claims, but they were all rejected. What this witness says about allowances being sometimes made on honour, on the character of the officer, clearly relates to a deficiency in the vouchers, and not to the admissibility of the charge. The whole bearing of this testimony is opposed to the credit claimed for Mr. Duval. He had no special authority from the secretary for the purchase or keeping of these horses; no evidence has been given to show that they were procured or kept or employed for any emergency in the public service so sudden and pressing that no application could be made for them to the secretary, consistent with the service. On the contrary, they were kept for nearly five years, not only without any request to, or permission from the secretary to warrant it, but without any intimation to him that such horses were in the employment of the government, or in the possession of their agent.

The testimony of Col. McKenney does not change this aspect of the case. He says, that an agent in the Indian country was not obliged to conform in all respects to the voucher system, and he gives a good reason for it. In speaking of the discretionary power, which, Col. McKenney believes, was vested in an agent, he explains himself by putting a case of emergency in which it would be impossible to get the instructions of the government; and he says, "under such circumstances it was expected of him to exercise a sound discretion, and to move in the case." He would then be allowed in his account "a reasonable expenditure in such an enterprise." This, the witness says, applies to any extraordinary occurrence within or without the agency, as if horses or canoes are wanted, they are allowed for. He says, the agent has to pay Indian annuities in specie; that horses are wanted to transport it; and adds, that a horse, sometimes two, is allowed for the use of the agent in his own personal intercourse with the different divisions of his agency; that two horses were generally considered to be a reasonable allowance for an agent; the horses to be bought by the government, and to be their property. This general allegation of such an allowance was qualified by the witness, in his answer to a question of the court, in which he said, an agent would not be allowed for keeping horses, unless it was specially allowed by the secretary of war, by which I understand that, when he said before that "two horses were generally considered to be a reasonable allowance for an agent," he meant that the allowance must be first obtained from the secretary, except in cases of emergency, and not that the agent might procure and keep the horses at his discretion, and afterwards make them a charge, as a matter of right, against the government.

I have looked through the evidence, in vain, for something by which I could, judicially, support the verdict of the jury in this particular. The charge of the court was very explicit against it, and, on a careful review of the case, I see no reason to change the opinion I had at the trial. By admitting this charge, we should introduce a new rule and principle in the settlement of the accounts of Indian agents, which may be very extensive and mischievous in its consequences. If the defendants had a right to this credit, I should not regard its disallowance by the accounting officers of the government, who necessarily transact their business by established rules, which cannot always conform to the right and justice of every case; but these defendants have tried to justify this charge, not by any positive law or legal right, but in the equity of an alleged usage of the department of war, when it is clear no usage exists there to countenance the claim.

After the delivery of the above opinion, the defendants' counsel appeared in open court, and agreed that judgment be entered for the United States of America, for one thousand and eighty-five dollars and twenty-eight cents, in conformity with the opinion of the court. Judgment accordingly for the United States of America, for one thousand and eighty-five dollars and twenty-eight cents.